UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| STEVEN FINK, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Case No. 4:12CV930 RWS |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent. | ) |

### MEMORANDUM AND ORDER

This matter is before me on Steven Fink's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody. Despite admitting that he defrauded numerous victims and lied to a federal agent, Fink now seeks to escape the consequences of his decision to plead guilty by blaming his attorneys. Because his motion is meritless, it will be denied for the reasons that follow.

**I.    Background**

The following facts are established by Fink's plea agreement entered in the underlying criminal case:

Between January 1, 2008 and April 30, 2010, defendant owned and operated Fink
Farms, in the Eastern District of Missouri. Defendant"backgrounded" cattle on the farm.
"Backgrounding" cattle involves receiving cattle and feeding them in preparation for
feedlots. Defendant received cattle from customers and agreed to maintain and feed the
cattle on defendant's farm. Defendant agreed to be paid based on the amount of weight
gained by the cattle while they were in defendant's care.

Douglas Winterfeld, Daniel Winterfeld and ClaDon Farms (hereinafter referred to
as "the Winterfelds") supply cattle to packing houses in Iowa. The Winterfelds' businesses
are located in Iowa. From approximately August 2009 until approximately April 2010, the
Winterfelds agreed with defendant that they would send cattle to defendant and that
defendant would background their cattle. The Winterfelds agreed to pay defendant 65 cents
for every pound that their cattle gained while at defendant's farm. The Winterfelds agreed

to pay defendant "yardage" that is, expenses related to backgrounding the cattle. Defendant agreed that the amount paid for yardage by the Winterfelds would be deducted from the amount paid by Winterfelds for the weight gain of the cattle.

The Winterfelds purchased cattle at various locations. Between August 1, 2009 and March 15, 2010, the Winterfelds shipped approximately 1,810 head of cattle in interstate commerce to defendant Steven Fink for backgrounding. The cattle were shipped in multiple loads.

Defendant repeatedly assured Douglas Winterfeld that the Winterfeld cattle were doing very well and that he was having no problems with the cattle when defendant knew that many cattle, including the Winterfeld cattle, had died. Defendant concealed from the Winterfelds that many cattle, including the Winterfeld cattle, were dying on his farm. Defendant told the Winterfelds to continue to send cattle to defendant's farm when he knew that the Winterfelds would not continue to send cattle to his farm if they knew that many cattle had died. In reliance on defendant's statements, the Winterfelds continued to ship their cattle to defendant for backgrounding. Defendant continued to bill the Winterfelds for yardage despite the death loss of the cattle. When the Winterfelds arrived in April 2010 to take all their cattle from defendant's farm, they determined that they were missing 747 cattle. Defendant was responsible for the loss. The Government asserts that the loss to the Winterfelds from defendant's scheme to defraud was a total of approximately $400,000. Defendant asserts that the Winterfelds are missing 558 head of cattle for a total loss of approximately $275,000. Specifically, defendant asserts that he did not receive two loads of cattle from the Winterfelds in September 2009 that the Winterfelds state were sent to him for backgrounding.

Robert Pinkerman owns and operates a farm located in Missouri. He buys and sells cattle. From approximately January 2006 until approximately April, 2010, Mr. Pinkerman agreed with defendant that he would send cattle to defendant and that defendant would background his cattle. Mr. Pinkerman agreed to pay defendant 48 to 50 cents for every pound that his cattle gained while at defendant's farm. Mr. Pinkerman purchased cattle at various locations. In 2008 and 2009, Mr. Pinkerman shipped approximately 943 head of cattle to defendant for backgrounding. The cattle were shipped in multiple loads. Defendant repeatedly assured Mr. Pinkerman that the Pinkerman cattle were doing very well and that he was having no problems with the cattle when defendant knew that many cattle, including the Pinkerman cattle, had died. Defendant concealed from Mr. Pinkerman that many cattle, including the Pinkerman cattle, were dying on his farm. Defendant told Mr. Pinkerman to continue to send cattle to his farm when, in truth and fact, he knew that Mr. Pinkerman would not continue to send cattle to defendant's farm if he knew that many cattle had died. In reliance on defendant's statements, Mr. Pinkerman continued to ship his cattle to defendant for backgrounding. The Government contends that, in April 2010, when Mr. Pinkerman went to defendant's farm to pick up his cattle, he discovered that over three hundred head of cattle were missing. The Government contends

that the loss to Mr. Pinkerman from defendant's scheme to defraud was a total of approximately $169,000. The defendant contends that Mr. Pinkerman is not missing any cattle and has not suffered any loss.

Between on or about February 1, 2010 and on or about February 20, 2010, in the Eastern District of Missouri and elsewhere, defendant, for the purpose of executing this scheme and artifice to defraud, and in attempting to do so, and to obtain money and property by means of material false and fraudulent pretenses, representations and promises, did knowingly and willfully transmit and cause to be transmitted in interstate commerce, certain signs, signals and sounds by means of a wire communication, that is, telephone calls from defendant to Douglas Winterfeld in which defendant told Mr. Winterfeld that Mr. Winterfeld's cattle were healthy and doing well and encouraging him to send more of his cattle to defendant's farm for backgrounding when, in fact, many cattle, including the Winterfeld cattle, had died.

On or about February 23, 2010, in the Eastern District of Missouri and elsewhere, defendant, for the purpose of executing the aforementioned scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses and representations, and attempting to do so, did knowingly and willfully cause to be deposited with a commercial or private interstate carrier to be delivered by said carrier and knowingly caused to be delivered by a commercial or private interstate carrier, that is, Mihm Transport, a shipment of cattle owned by Doug and Dan Winterfeld and Cla-don Farms from Glasgow, Kentucky, to defendant in Bevier, Missouri.

Marvin Kasik owns and operates Kasik Feedlots, located in Nebraska. He supplies cattle to packing houses. From approximately February 2009 until approximately March 31, 2010, Mr. Kasik agreed with defendant that he would send cattle to defendant and that defendant would background his cattle. Mr. Kasik agreed to pay defendant 60 cents for every pound that his cattle gained while at defendant's farm. Mr. Kasik agreed to pay defendant "yardage," that is, expenses related to backgrounding the cattle. Defendant agreed that the amount paid for yardage by Mr. Kasik would be deducted from the amount paid by Mr. Kasik for the weight gain of the cattle. Mr. Kasik purchased cattle at various locations. Between February 2009 and March 31, 2010, Mr. Kasik shipped approximately 1881 head of cattle to defendant for backgrounding. Some of the cattle were shipped in interstate commerce. The cattle were shipped in multiple loads.

Defendant repeatedly assured Mr. Kasik that the Kasik cattle were doing very well and that he was having no problems with the cattle when, in truth and fact, defendant knew that many cattle, including the Kasik cattle, had died. Defendant concealed from Mr. Kasik that many cattle, including the Kasik cattle, were dying on defendant's farm. Defendant told Mr. Kasik to continue to send cattle to his farm when he knew that Mr. Kasik would not continue to send cattle to defendant's farm if he knew that many cattle had died. In reliance on defendant's statements, Mr. Kasik continued to ship his cattle to defendant for

backgrounding. Defendant continued to bill Mr. Kasik for yardage despite the death loss of the cattle. When Mr. Kasik came to remove his cattle, he determined that 515 of his cattle were missing. Defendant was responsible for the loss. The Government contends that the loss to Mr. Kasik from defendant's scheme to defraud was a total of approximately $270,900. The defendant disputes the amount of loss.

Between on or about February 25, 2010 and on or about March 23, 2010, in the Eastern District of Missouri and elsewhere, defendant, for the purpose of executing this scheme and artifice to defraud, and in attempting to do so, and to obtain money and property by means of material false and fraudulent pretenses, representations and promises, did knowingly and willfully transmit and cause to be transmitted in interstate commerce, certain signs, signals and sounds by means of a wire communication, that is, a telephone call between defendantand Marvin Kasik in which defendant assured Mr. Kasik that the Kasik cattle were doing well.

On or about March 31, 2010, in the Eastern District of Missouri and elsewhere, defendant, for the purpose of executing the aforementioned scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses and representations, and attempting to do so, did knowingly and willfully cause to be deposited with a commercial or private interstate carrier to be delivered by said carrier and knowingly caused to be delivered by a commercial or private interstate carrier, that is Bilbrey Brothers Livestock, a shipment of cattle owned by Mr. Marvin Kasik from Cookville, Tennessee to defendant in Bevier, Missouri.

Mr. Charles Morrison sent 64 cattle to defendant for backgrounding. When he attempted to remove his cattle from defendant's farm, he learned that all his cattle were missing. The Government contends that the loss to Mr. Morrison is approximately $32,000. Defendant disputes the amount of loss.

James Landrum owns and operates a farm located in Missouri. He buys and sells cattle.

From approximately January 2005 until approximately April, 2010, Mr. Landrum agreed with defendant that he would send cattle to defendant and that defendant would background his cattle. Mr. Landrum agreed to pay defendant 40 cents for every pound that his cattle gained while at defendant's farm. Mr. Landrum agreed to pay defendant"yardage," that is, expenses related to backgrounding the cattle. Defendant agreed that the amount paid for yardage by Mr. Landrum would be deducted from the amount paid by Mr. Landrum for the weight gain of the cattle. Mr. Landrum purchased cattle at various locations. Between November 2008 and August 2009, Mr. Landrum shipped approximately 202 head of cattle to defendant for backgrounding. The cattle were shipped in multiple loads.

Defendant repeatedly assured Mr. Landrum that the Landrum cattle were doing very

well and that he was having no problems with the cattle when, in truth and fact, defendant knew that many cattle, including the Landrum cattle, had died. Defendant concealed from Mr. Landrum that many cattle, including the Landrum cattle, were dying on defendant's farm. Defendant told Mr. Landrum to continue to send cattle to his farm when he knew that Mr. Landrum would not continue to send cattle to his farm if Mr. Landrum knew that many cattle had died. In reliance on defendant's statements, Mr. Landrum continued to ship his cattle to defendant for backgrounding.

Defendant continued to bill Mr. Landrum for yardage despite the death loss of the cattle. When Mr. Landrum attempted to remove his cattle from defendant's farm, defendant told him that his cattle were gone. Mr. Landrum had 58 cattle missing. Defendant was responsible for the loss. The Government contends that the loss to Mr. Landrum from defendant's scheme to defraud was a total of approximately $32,000. Defendant disputes the amount of loss.

Between June 2009 and November 2009, in the Eastern District of Missouri and elsewhere, defendant, for the purpose of executing the aforementioned scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses and representations, and attempting to do so, did knowingly and willfully cause to be placed in the mail to be delivered by mail and knowingly caused to be delivered by mail a letter addressed to defendant, 23992 State Highway OO, Bevier, Missouri 63532, containing a check payable to defendant drawn on the bank account of James Landrum in which Mr. Landrum paid defendant for yardage.

Defendant was interviewed by Federal Bureau of Investigation Special Agent Keith Kohne on several occasions. Agent Kohne told defendant that it was important that defendant be honest with the agent and that lying to a federal agent was a crime. On June 10, 2010, Agent Kohne spoke to defendant at his farm. He asked defendant if he had ever had anyone sell cattle from his farm in another person's name. Defendant denied doing so. In fact, defendant had Jeffrey Moore sell cattle for defendant in Mr. Moore's name at Green City Livestock on or about August 19, 2009, and on or about September 16, 2009, and at Lolli Brothers Livestock on or about December 1, 2009. Defendant received the funds from the sales.

Criminal Case No. 4:10CR593 RWS [Doc. # 47, pp. 3-10].

On November 18, 2010, Fink was indicted on two counts of wire fraud in violation of 18 U.S.C. § 1343, three counts of mail fraud in violation of 18 U.S.C. § 1341, and four counts of false statements in violation of 18 U.S.C. § 1001.  Fink pled guilty to all counts of the indictment on November 3, 2011.  At his change of plea hearing, Fink was placed under oath and swore to

testify truthfully, subject to the penalties of perjury.  I held the following colloquy with Fink about his attorneys:

JUDGE: Have you had enough time to discuss your case with your attorneys?

FINK: Yes.

JUDGE: Are you satisfied with their representation of you in this case?

FINK: Yes.

JUDGE: Is there anything you think your attorneys should have done but did not do in representing you?

FINK: No.

Case No. 4: 10CR593 [Doc. #102 at 6].  Fink then told me that he read the plea agreement before he signed it as follows:

JUDGE: Did you read this document [plea agreement] before you signed it?

FINK: Yes.

JUDGE: Did you go over it with your counsel?

FINK: Yes.

JUDGE: Did they answer all your questions?

FINK: Yes.

JUDGE: Do you believe you understand what's in this document?

FINK: Yes.

JUDGE: **Is everything in here true?**

FINK: **Yes.**

Case No. 4: 10CR593 [Doc. #102 at 8-9] (emphasis added).  Later in the hearing Fink again

reiterated that the facts recited in his plea agreement were true and that "he did what [the Assistant United States Attorney] says [he] did." Id. at 25. Fink reserved the right to contest the amount of loss and restitution at sentencing and waived his right to appeal a Guidelines range sentence.

A presentence report (PSR) was prepared which determined Fink's total offense level to be 18, with a criminal history category of 1 and a Guidelines range of 27-33 months incarceration. On February 9, 2012, Fink filed objections to the amount of loss and restitution contained in the PSR. On February 29, 2012, I held a four-hour sentencing hearing. The Assistant United States Attorney called four witnesses – Douglas Winterfeld, Marvin Kasik, Lawrence Sutton, and Keith Kohne – each of whom was vigorously cross-examined by defense counsel. Fink opted not to testify. At the conclusion of the hearing, I sentenced Fink to concurrent terms of 24 months imprisonment on each of the counts in the indictment and ordered restitution in the amount of $938, 475.

Despite his below Guidelines sentence and appeal waiver, Fink filed an untimely notice of appeal on April 2, 2012. He subsequently dismissed his appeal on June 28, 2012, only to file the instant motion the next day.

## II.     Grounds for Relief

Fink's §2255 motion alleges the following ineffective assistance of counsel claims:

1) Failure to investigate the weight tickets of the victims' cattle thereby showing that the economic impact was significantly less;

2) Failure to investigate the number of cattle brought and removed from Fink's farm which would have shown that he did not make any false statements;

3) Failure to investigate the weight tickets of cattle removed which would have shown that Fink

was owed money from the victims;

4) Failure to present any argument at the sentencing hearing as to the number of cattle brought and removed from Fink's farm which would have reduced the amount of restitution;

5) Failure to investigate public and government records which revealed that victims Robert Pinkerman and James Landrum "may not have reported the purchase of cattle" thereby raising issues concerning their testimony;

6) Failure to investigate whether the government withheld information that Pinkerman and Landrum failed to disclose the sale and purchase of cattle on their personal property taxes;

7) Failure to investigate alleged statements by Pinkerman that he really did not have cattle missing but might as well get some money;

8) Failure to investigate whether the government knew that Pinkerman did not lose any cattle and thereby suborned false testimony;

9) Failure to obtain weight tickets of cattle removed which would have shown that the majority of cattle were doing fine and that Fink therefore did not lie and that the victims owed Fink money for the weight gain;

10) Failure to investigate whether the government withheld the weight tickets which would have shown Fink's innocence;

11) Failure to investigate whether the victims knew that the cattle were ill and could not have relied on Fink's statements that the cattle were doing well; and

12) Failure to investigate whether FBI Agent Keith Kohne misled the grand jury by testifying that a person from the Department of Natural Resources was at Fink's farm, and if so, whether the grand jury process and Fink's indictment were tainted.

### III.   Analysis

####   A.   *An Evidentiary Hearing is not Warranted*

I will not hold an evidentiary hearing on this matter. "A petitioner is entitled to an evidentiary hearing on a section 2255 motion unless the motion and the files and records of the case conclusively show that he is entitled to no relief." Anjulo-Lopez v. United States, 541 F.3d 814, 817 (8th Cir. 2008) (internal quotation marks omitted). An evidentiary hearing need not be

held if Fink's "allegations cannot be accepted as true because they are contradicted by the record, inherently incredible or conclusions rather than statements of fact." Delgado v. United States, 162 F.3d 981, 983 (8th Cir. 1998); see also Anjulo-Lopez, 541 F.3d at 817 (no hearing required where claim is "inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based.") (internal quotation marks and citation omitted).  Because the records conclusively show that Fink is not entitled to relief as a matter of law, I need not hold a hearing.

      B.      *Ineffective Assistance of Counsel Claims*

All of Fink's claims are ineffective assistance of counsel claims.  The Sixth Amendment establishes the right of the criminally accused to the effective assistance of counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  To state a claim for ineffective assistance of counsel, Fink must prove two elements of the claim.  First, he "must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." Id. at 687.  In considering whether this showing has been accomplished, "judicial scrutiny of counsel's performance must be highly deferential." Id. at 689.  The courts seek to "eliminate the distorting effects of hindsight" by examining counsel's performance from counsel's perspective at the time of the alleged error.  Id.  Second, Fink "must show that the deficient performance prejudiced the defense."  Id. at 687.  This requires him to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.  In the context of guilty pleas, a movant must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985); Matthews v. United States, 114 F.3d 112, 114

(8th Cir. 1997).  The court need not address both components if the movant makes an insufficient showing on one of the prongs.  Engelen v. United States, 68 F.3d 238, 240 (8th Cir. 1995).

Fink's ineffective assistance of counsel claims must be evaluated in light of the fact that he entered a guilty plea in the underlying criminal case.  "While a guilty plea taken in open court is not invulnerable to collateral attack in a post conviction proceeding, the defendant's representations during the plea-taking carry a strong presumption of verity and pose a formidable barrier in any subsequent collateral proceedings."  Nguyen v. United States, 114 F.3d 699, 703 (8th Cir. 1997) (internal citations omitted).  Although Fink's claims are couched as ineffective assistance of counsel claims, he is really arguing that he is not guilty of the underlying crimes.  Yet Fink stood before me, in open court, and admitted under oath that he was guilty, that everything in his plea agreement was true, and that he was not coerced to plead guilty.  He also told me that he was satisfied with the representation of his attorneys and that they had done everything he had asked them to do.  Fink cannot contradict those prior sworn statements now.

As for Fink's claim that his attorneys were ineffective for failing to investigate weight tickets of the victims' cattle, this evidence was irrelevant to his guilt and sentence so Fink cannot demonstrate that he was prejudiced by any alleged error.  Fink admitted that he committed mail and wire fraud by falsely telling his victims that their cattle were fine when, in fact, large numbers were dead or dying.  That Fink may have shipped other living cattle to the victims (and that some of those cattle may have gained weight) is wholly irrelevant to the falsity of the statements for which Fink pled guilty.  The weight tickets were also irrelevant at sentencing.  Fink incorrectly believes that he was entitled to an offset of his restitution for funds allegedly owed by the victims for *other* cattle.  Fink is wrong.  Restitution established the loss to the

victims resulting from Fink's fraudulent conduct.  It was not a final accounting of funds owed between Fink and the victims.  Therefore, any alleged omission by his attorneys to investigate the weight tickets did not prejudice Fink, and his ineffective assistance of counsel claim fails.

Fink complains that his attorneys failed to investigate the number of cattle brought and removed from his farm.  As with the weight tickets, any alleged error did not prejudice Fink because this issue is irrelevant to a determination of whether Fink made false statements.  As for Fink's claim in Ground 4 that his attorneys failed to present any argument on this issue, the claim is refuted by the record.  This issue was extensively litigated during the sentencing hearing, with defense counsel vigorously cross-examining all the witnesses and challenging the number of cattle.  Fink fails to specify what additional investigation his attorneys should have done.  Generic allegations of error are insufficient to demonstrate either deficient performance or the requisite prejudice, so Grounds 2 and 4 of Fink's §2255 motion will be denied.

Ground 3 is merely a restatement of Ground 1 and will be denied for the same reasons.  Again, evidence that the victims may have owed Fink for other business dealings is not relevant to a determination of Fink's guilt or a calculation of loss or restitution.[1]

In his next claims, Fink argues that his attorneys should have attacked some of the victims in this case by revealing that they "may not have reported the purchase of cattle" or that one may have stated "he really did not have cattle missing."  These claims fail.  These victims did not testify at the sentencing hearing, so this alleged "impeachment evidence" -- even if it did exist – could not have been used.  Moreover, the determination of lost cattle was based on Fink's

---

[1]Fink attempts to minimize his crimes by repeatedly referring to his victims as "victims." Such cheap theatrics are ineffective and only serve to undermine the substance of Fink's motion and the integrity of his §2255 attorney.

own statements and records, not on victim testimony. Therefore, Fink cannot demonstrate that he was prejudiced by any alleged error, and Grounds 5, 6, and 7 must be denied.

As for Ground 8, the records conclusively demonstrate that the government provided to defense counsel evidence that one of the victims allegedly told someone else that "he really did not have cattle missing." Therefore, any claim that counsel was deficient for failing to investigate alleged prosecutorial misconduct must fail.

Grounds 9 and 10 relate once again to the weight tickets. As I have previously explained, even if some of the victims' cattle were doing well, this evidence is irrelevant to a determination of the falsity of the statements for which Fink pled guilty. The fact that all the cattle did not die is not a defense to Fink's crimes, nor is the purported weight gain of some of the victims' other cattle relevant to the amount of loss or restitution. Again, loss is based upon Fink's fraudulent actions and is not an accounting of business dealings between Fink and his victims. Fink's allegation that the government withheld weight tickets is completely unsupported by the record in this case. Numerous documents listing the weight of the cattle shipped were produced by the government during discovery. Moreover, the weight tickets are irrelevant to a determination of guilt or loss, so any alleged failure to investigate this purported prosecutorial misconduct did not prejudice Fink. For these reasons, Grounds 9 and 10 will be denied.

In Ground 11, Fink claims that his attorney was ineffective for failing to investigate whether the victims actually knew their cattle were ill and therefore could not have relied upon his statements that they were doing well. This unsupported assertion (that the victims actually knew their cattle were dying) is purely speculative and cannot support an ineffective assistance of counsel claim. Ground 11 fails.

Finally, in Ground 12 Fink contends that his attorneys should have investigated whether FBI Agent Kohne incorrectly told the grand jury that a person with the Department of Natural Resources had been at Fink's farm. Fink argues that this statement tainted the grand jury process and his indictment. However, Fink cannot demonstrate that he was prejudiced by this alleged error because none of Fink's charges were based on anything related to the Department of Natural Resources, and Fink cannot show that the statement substantially influenced the grand jury's decision to indict. See Bank of Nova Scotia v. United States, 487 U.S. 250, 256 (1988) (holding that "dismissal of the indictment is appropriate only if it is established that the violation substantially influenced the grand jury's decision to indict . . . .") (internal quotation marks and citation omitted). Because Fink cannot demonstrate the requisite prejudice, Ground 12 of his § 2255 motion will be denied.

    C.    *Certificate of Appealability*

As Fink has not made a substantial showing of the denial of a federal constitutional right, this Court will not issue a certificate of appealability. See Cox v. Norris, 133 F.3d 565, 569 (8th Cir. 1997) (citing Flieger v. Delo, 16 F.3d 878, 882-83 (8th Cir. 1994)) (substantial showing must be debatable among reasonable jurists, reasonably subject to a different outcome on appeal, or otherwise deserving of further proceedings).

Accordingly,

**IT IS HEREBY ORDERED** that the motion of Steven Fink to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255 [#1] is denied.

**IT IS FURTHER ORDERED** that this Court will not issue a certificate of appealability, as Fink has not made a substantial showing of the denial of a federal constitutional right.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 6th day of November, 2012.